**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| **DANIEL J. SCOTT,** | |
| Plaintiff, | **No. 11-CV-4055-DEO** |
| vs. | **Memorandum and Opinion Order** |
| **MARY BENSON, IOWA CIVIL COMMITMENT UNIT FOR SEX OFFENDERS, AND JASON SMITH,** | |
| Defendants. | |

## I.  INTRODUCTION AND BACKGROUND

On June 14, 2011, Plaintiff filed a 42 U.S.C. Section 1983 Complaint with this Court.  Docket No. 2-1.  Plaintiff is committed to the Iowa Civil Commitment Unit for Sex Offenders (CCUSO)[1] in Cherokee, Iowa.  Defendant Mary Benson is a nurse at CCUSO, and Defendant Jason Smith is CCUSO's director. Plaintiff's complaint generally alleges that Defendants have provided him constitutionally deficient medical treatment,

---

[1] CCUSO is not a prison facility; it "provides a secure, long term, and highly structured environment for the treatment of sexually violent predators."  Iowa Department of Human Services   Offer   #410-HHS-014:   CCUSO,   1 http://www.dhs.state.ia.us/docs/11w-401-HHS-014-CCUSO.pdf, last visited September 27, 2012.  The patients at CCUSO "have served their prison terms but in a separate civil trial have been found likely to commit further violent sexual offenses." Id.

resulting in unnecessary pain and suffering, hospitalization, and the amputation of a portion of his lower right leg and foot.  Docket No. 2-1.

Currently before this Court is Defendants' Partial Motion to Dismiss and Defendants' Motion for Summary Judgment. Docket Nos. 24 and 34.  Defendants' Motion to Dismiss contends Section 1983 claims against state entities, such as CCUSO, or persons acting in their official capacities are improper. Docket No. 24.  Defendants' Motion for Summary Judgment contends Defendants' actions were not in violation of the Constitution or laws of the United States; and even if Defendants did violate the Constitution or laws of the United States, they are entitled to qualified immunity.  Docket Nos. 34 and 34-2.

## II.  MOTION TO DISMISS

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) provides that a Defendant may assert a defense for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

## A. State Actor Requirement

42 U.S.C. § 1983 specifically provides for a federal cause of action against a "person" who, under color of state law, violates another's federal rights. In <u>Will v. Michigan Dept. of State Police</u>, the Supreme Court ruled "that a State is not a person within the meaning of § 1983." 491 U.S. 58, 63 (1989). Because CCUSO is a state facility, a suit against it pursuant to Section 1983 is improper. In Plaintiff's Response Brief to Defendant's Summary Judgment Motion, "Plaintiff concedes that CCUSO is not a person" under Section 1983. Docket No. 37-1. **Therefore, Plaintiff's cause of action against CCUSO is hereby dismissed.**

## B. Failure to Allege Defendant Smith Violated the Constitution or Laws of the United States

In order to sustain a Section 1983 action, "'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution'" or laws of the United States. <u>Parrish v. Ball</u>, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1948 (2009)). In Plaintiff's Response Brief to Defendant's Summary Judgment Motion, Plaintiff admits that

he has failed to allege that Defendant Jason Smith violated the Constitution or laws of the United States. Docket No. 37-1. Furthermore, though Defendant Jason Smith is Defendant Mary Benson's superior, and Plaintiff has clearly alleged that Defendant Mary Benson (through her individual actions) has violated the Constitution, "'vicarious liability is inapplicable to . . . § 1983 suits . . . .'" <u>Parrish</u>, 594 F.3d at 1001 (quoting <u>Iqbal</u>, 129 S. Ct. at 1948). **Therefore, Plaintiff's cause of action against Defendant Jason Smith is hereby dismissed.**

### C. Persons Acting in Their Official Capacities

While Defendant is correct to note that state officials generally cannot be sued in their official capacities under § 1983, state officials can be sued in their individual capacities. <u>Hafer v. Melo</u>, 502 U.S. 21, 22-23 (1991). Furthermore, all suits naming state officials in their official capacity are not per se banned from consideration under § 1983. In <u>Will v. Michigan Dept. of State Police</u>, the Supreme Court clearly noted that state officials sued in their official capacity are, when injunctive relief is sought, "persons" under § 1983, "because 'official-capacity actions

for prospective relief are not treated as actions against the State.'"[2]  491 U.S. 58, 71, fn 10 (quoting <u>Kentucky v. Graham</u>,473 U.S. 159, 167, fn. 14 (1985)).

It is unclear from Plaintiff's complaint whether he intended to sue Defendants in their official or individual capacities, but pro se complaints,[3] no matter how "inartfully pleaded[,] are held to less stringent standards than formal pleadings as drafted by a lawyer." <u>Hughes v. Rowe</u>, 449 U.S. 5, 9 (1980) (internal citations omitted).  Plaintiff is

_____

[2]  The distinction rests on a balance of three considerations: (1) state sovereign immunity protects states from suits that seek to "'impose liability which must be paid from public funds in the state treasury;'" (2) suits against state officials in their official capacities are, in effect, suits against the state; for instance, if a state official, sued in his official capacity, dies or leaves office, their successor must continue to defend the suit; and (3) § 1983 was designed "'to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position.'"  <u>Hafer v. Melo</u>, 502 U.S. 21, 25, 27, and 30 (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 172 (1961) and <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974)).  In balancing these three policy considerations, the Supreme Court has ruled that officials may be sued in their individual capacities for monetary damages, and, in order to prevent the repetition of an on-going wrong under the guise of state authority, in their official capacities for injunctive relief.

[3]  Though Plaintiff now has counsel, his complaint on record was filed pro se.

alleging government officials are violating his constitutional rights in a manner he perceives to have real and unjust consequences; the question of whether he is suing the defendants in their official or individual capacities, though it has a real and important effect, no doubt appears academic to the Plaintiff. Such questions involve points of law no layman should be expected to know. Thus, this Court will assume Plaintiff sought any relief which could be reasonably inferred from his complaint, including monetary damages against Defendants in their individual capacities and injunctive relief against Defendants in their individual and official capacities. **However, in as far as Plaintiff seeks monetary damages against Defendants in their official capacities, Defendants' Motion to Dismiss is granted.**

## III.  FACTS

The remaining Defendant, Nurse Mary Benson, is the head nurse of Plaintiff's unit; as such, Ms. Benson is responsible for the day-to-day health care needs of Plaintiff and the other patients in the unit.

Plaintiff alleges that on August 2, 2010, he first saw Defendant Benson in relation to an infected lump within his

6

thigh.  Tr. 37-3, 1.  Plaintiff claims Defendant looked at his thigh and denied Plaintiff's request for antibiotics.  Id. Defendant contends that though she saw Plaintiff on August 2, 2010, he did not complain of an infected lump within his thigh.  Docket No. 38-1, 1.

Plaintiff alleges that on August 10, 2010, he went to the medical unit, but Defendant refused to look at the infection on his thigh.  Docket No. 37-3, 1.  The Defendant denies she saw Plaintiff on August 10.[4]

Plaintiff claims that on August 17, 2010, Defendant agreed to look at the infected area on Plaintiff's thigh. Docket No. 37-3, 1.  According to Plaintiff, despite the fact that he could squeeze puss from the infected area, Defendant refused to give him antibiotics.  Docket No. 37-3, 1. Defendant contends, and the medical records corroborate, that Plaintiff was seen on August 16, 2010, rather than August 17, 2010.  Docket No. 38-1, 1.  Defendant also contends, and the

---

[4]  Plaintiff's response actually indicates "CCUSO has no record of Mr. Scott seeking care on Tuesday September 10, 2010."  Docket No. 38-1, 1.  Because it is a response to Plaintiff's Statement of Undisputed Facts, this Court is assuming the reference to September 10, as opposed to August 10, was a typographical error.

medical records corroborate, that Plaintiff was in fact
prescribed an antibiotic, Cipro. Docket No. 38-1, 1 and
Docket No. 34, 32.

Plaintiff claims that on August 25, 2010, Defendant again
denied him antibiotics and screamed, "There's nothing wrong
with you, all you are wanting is attention - stop it now."
Docket No. 37-3, 2. Defendant contends, and the medical
records corroborate, that Plaintiff was seen on August 23 and
again on August 27 but was not seen on August 25. Docket No.
38-1, 1 and Docket No. 34, 33-35. Defendant also contends,
and the medical records corroborate, that Plaintiff was placed
on the anti-biotic Augmentin on August 27, 2010. Docket No.
38-1, 1 and Docket No. 34, 35.

Both parties agree that an incident report, dated
September 1, 2010, indicates Plaintiff requested CCUSO staff
view his infected area. Docket No. 34-1, 3 and Docket No. 37-
2, 3. Staff notes indicate "some swelling and purplish
coloring to the alleged infected area," as well as "what
seemed to be a sore" without drainage. Docket No. 34-1, 3.

Plaintiff claims that on September 4, 2010, Defendant
again refused to look at Plaintiff's infection or to prescribe

antibiotics. Docket No. 37-3, 2. Defendant notes that September 4, 2010 was a Saturday, and she was not on duty. Docket No. 38-1, 2. Medical records indicate CCUSO staff contacted Defendant at home at 3:00 a.m, and she called in to monitor the situation throughout the morning. Docket No. 34, 39. Plaintiff was repeatedly gagging and placed on bed rest and a liquid diet. Docket No. 34, 39.

Both parties agree that on September 7, 2010, Defendant noted a 13 by 6 centimeter necrotic patch on Plaintiff's scrotum; and, after consult with Dr. Veit, the medical director at CCUSO, Plaintiff was sent to the local hospital. Docket Nos. 34, 2, 34-1, 4, and 37-2, 3. The local hospital then sent Plaintiff to the University of Iowa Hospitals and Clinics where portions of his infection were surgically removed. Docket No. 34, 2. Plaintiff contends that people at the University of Iowa told him it "was the worst case of gangrene they had ever seen," and it "must have set in one and a half to two weeks before treatment from the hospital." Docket No. 37-3, 2.

While at the University of Iowa Hospitals and Clinics, Plaintiff suffered a heart attack due to complications from

surgery.  Docket No. 37-3.  The Defendant admits that Plaintiff suffered a heart attack but denies that it was related to his infection or surgery.  Docket No. 38-1, 2 and Docket No. 34, 4.

Plaintiff claims that on October 16, 2010, he suffered from fluid loss, sepsis,[5] and kidney failure and was again transported to the local hospital and then to the University of Iowa Hospitals on October 18, 2010.  Docket No. 37-3, 3. Defendant maintains Plaintiff did not suffer from fluid loss. Docket No. 38-1, 2.  The University of Iowa Hospitals amputated Plaintiff's lower left leg on October 27, 2010. Docket No. 37-3, 3.

The Defendant contends Plaintiff is an extremely difficult patient and varies as to whether he will accept medical treatment in relation to his various ailments.  Docket No. 34-1.  For instance, though Plaintiff is a diabetic, he has consistently refused to adhere to recommended dietary restriction or self-care practices.  Docket No. 34-1.  More

_____

[5] "Sepsis is an illness in which the body has a severe response to bacteria or other germs." *Sepsis*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001687/, last visited September 27, 2012.

specifically, in relation to Plaintiff's recurrent boils and ulcers, Defendant maintains Plaintiff has consistently refused to keep them clean, free of pressure,[6] and apply dressings to protect them during the healing process.  Docket No. 34-1, 2.[7]

## IV.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P., Rule 56(c).  A fact is material if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  There is a genuine issue as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party.  <u>Matsushita Elec.</u>

---

[6] Plaintiff, though he can stand and has some ability to walk, is in a wheelchair.

[7] The Defendant also notes several instances of Plaintiff refusing treatment or otherwise being uncooperative after his leg was amputated, but, as these events occurred after Plaintiff's alleged harms, these events are not as pertinent as the events leading up to Plaintiff's need for an amputation and are not specifically enumerated.

Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the nonmoving party . . . ." Hutson v. McDonnell Douglas Corp., 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence, making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the moving party unless there is no reasonable alternative. See Matsushita, 475 U.S. at 587; and Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007)).

Procedurally, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Celotex, 477 U.S. at 323). Once the movant has carried his burden, the non-moving party is required "to go beyond the pleadings" and through "affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 423 (citing Fed. R. Civ. P. 56(e)).

## V.  LAW AND ANALYSIS

Both Plaintiff and Defendant contend that the deliberate indifference standard announced by the Supreme Court in <u>Estelle v. Gamble</u>, which is typically applied to Eighth Amendment cruel and unusual punishment cases, applies in this case.  Docket Nos. 34-2, 4 and 37-1, 4-5; 429 U.S. 97 (1976). Under the deliberate indifference standard, a plaintiff must show:  (1) he had an objectively serious medical need; and (2) the Defendant knew of plaintiff's medical need and deliberately chose to disregard it.  <u>Meuir v. Greene County Jail Employees</u>, 487 F.3d 1115, 1118 (8th Cir. 2007).

After reviewing relevant case law, this Court is persuaded that deliberate indifference is inapplicable. Because deliberate indifference analysis is typically employed in Eighth Amendment cases involving prisoners, its application to involuntarily committed wards of the State, whom "are entitled to more considerate treatment than criminals whose

conditions of confinement are designed to punish," is inappropriate.  Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).  "The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication in accordance with due process of law."  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199 n. 6 (1989).

In Youngberg v. Romeo, the Supreme Court specifically indicated that the deliberate indifference test is inapplicable to involuntarily committed persons.  457 U.S. at 312, n. 11.  Though the Eighth Circuit has subsequently used the deliberate indifference test in relation to involuntarily committed patients, they did so because "neither party . . . questioned the applicability of the Eighth Amendment."  382 F.3d at 874.  However, the parties to an action cannot alter applicable law simply because they agree to,[8] and Supreme Court case law takes precedent over Eighth Circuit case law.

The Youngberg Court recognized that though the Eighth Amendment is inapplicable, involuntarily committed persons

---

[8] The exception to this rule may be within a contract, but there is no contract at issue here.

have substantive rights arising under the Fourteenth Amendment. 457 U.S. at 315. Though "a State is under no constitutional duty to provide substantive services for those within its border . . . [w]hen a person is institutionalized," the State "has a duty to provide certain services and care . . . ." Id. at 317. Among the most basic substantive liberty interests to which involuntarily committed persons are entitled are rights "to adequate food, shelter, clothing, and medical" care. Id. at 315.

However, "a State necessarily has considerable discretion in determining the nature and scope of its responsibilities." Id. at 317. "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" Id. at 320 (citing Poe v. Ullman, 367 U.S. 497, 542 (1961)). In addition, a court should keep their interference with the operations of State operated civil commitment facilities to a minimum. Id. at 322. "[T]here certainly is no reason to think judges or juries are better qualified than appropriate professionals in

making" the difficult decisions necessary to run such facilities. Id. at 323.

Though specifically dealing with the treatment of an involuntarily committed patient's mental condition which was the basis of his commitment, this Court is persuaded that the standard crafted in Youngberg is applicable here. See McDonald v. Eilers, 1988 WL 131360 (E.D. Pa. 1988) (applying Youngberg in case involving the adequacy of medical treatment). In Youngberg, the Court stated that the decision in question,

> if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.

467 U.S. at 323.

The Defendant has pointed to facts indicating that Plaintiff is, at times, an extremely difficult and uncooperative patient. However, the Plaintiff has pled facts, which (at least for purposes of summary judgment) this Court will accept as true, indicating Defendant repeatedly refused to treat him for what started as a routine infection. For

16

instance, Plaintiff alleges he first told Defendant about an infected lump on his thigh on August 2, 2010, but Defendant refused to give him antibiotics. Plaintiff also alleges that Defendant refused to see Plaintiff on August 10, 2010. Plaintiff also alleges that on August 17, 2010, though he could squeeze puss out of the infected area, Defendant refused to prescribe antibiotics. Plaintiff also alleges that he was denied treatment and antibiotics on August 25, 2010, and again on September 4, 2010. Finally, both parties agree that on September 7, 2010, Plaintiff was sent to the hospital, and, by this time, his infection had gotten so bad that portions of his body had to be surgically removed. While much of Plaintiff's allegations seem to be contradicted by medical records, those records were more than likely created by Defendant, and it is for a jury, not this Court, to determine issues of credibility.

When, as here, a Plaintiff, who is a ward of the state, alleges a defendant repeatedly denied antibiotics and treatment for something as simple as a spreading infection, this Court is persuaded that the Defendant's actions constitute a substantial departure from accepted professional

judgment, practice, or standards.

## VI.  QUALIFIED IMMUNITY

Defendant contends she is entitled to a defense of qualified immunity as to all of Plaintiff's claims.  The Supreme Court has established a two step sequential evaluation process to resolve questions of qualified immunity.[9]  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  The "'threshold question'" is whether the facts, taken in a "'light most favorable to the party asserting the injury,'" demonstrate the defendant's "'conduct violated a constitutional right'" of the plaintiff.  <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).  If there is a "violation of constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'"  <u>Id.</u>

The first question in the sequential evaluation process is straight forward and merely asks if there is a constitutional violation under prevailing law.  The second

---

[9] More recently, in <u>Pearson v. Callahan</u>, the Supreme Court ruled that the sequential evaluation process outlined in <u>Saucier</u> was not mandatory; lower courts retain discretion whether to follow the <u>Saucier</u> procedure.  555 U.S. 223, 236 (2009).

question in the sequential evaluation process requires that the "contours of the right . . . be sufficiently clear" such "that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202. "If the law did not put the [official] on notice that his conduct would be clearly unlawful," a motion to dismiss "based on qualified immunity is appropriate." Id. While the first and second steps are quite similar, the second step adds an additional dimension in that "reasonable mistakes can be made as to the legal constraints on particular" official conduct, regardless of whether or not there was an actual constitutional violation. Id. at 205.

As previously noted, the State "has a duty to provide certain services and care" to "institutionalized" persons. Youngberg, 457 U.S. at 317. Among the most basic of these duties is the duty to provide adequate medical care. Id. at 315. Plaintiff alleges Defendant repeatedly denied him basic medical treatment, which when accepted as true for purposes of summary judgment, constitutes a violation of Plaintiff's substantive due process rights guaranteed under the Fourteenth Amendment. Furthermore, this Court is persuaded that an

institutionalized person's right to basic medical treatment is a clearly established right; that is, a reasonable official who denies basic medical services to an institutionalized person would understand that what he or she was doing was violative of the institutionalized person's constitutional rights.

## VII.   CONCLUSION

**As previously noted, Plaintiff's claim against Defendant Jason Smith is hereby dismissed; Plaintiff's claim against CCUSO is here by dismissed; and Plaintiff's claim, in as far as it seeks monetary damages for Defendant Benson's actions undertaken in her official capacity, is hereby dismissed.**

Though this Court has its doubts that Plaintiff is an accurate historian, and his allegations significantly differ from the medical records on file, issues of credibility are best left to the jury. **Whether Defendant Benson, acting in her individual capacity, denied Plaintiff basic medical treatment, despite repeated requests, remains a material and genuine issue of fact. Furthermore, Defendant, under the circumstances here alleged, is not entitled to qualified**

**immunity. Therefore, Defendant's request for summary judgment**

**is hereby denied consistent with this Order.**

      **IT IS SO ORDERED** this 28th day of September, 2012.

                _Donald E. O'Brien_

                Donald E. O'Brien, Senior Judge
                United States District Court
                Northern District of Iowa