# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

DANIEL J. SCOTT,

            Plaintiff,

vs.

MARY BENSON,

            Defendant.

No. C11-4055-MWB

**MEMORANDUM OPINION AND ORDER**

---

## I. INTRODUCTION

In this extremely tragic case, I must decide whether the defendant, Nurse Mary Benson, provided the plaintiff, Daniel "Danny" Scott, a patient at the Civil Commitment Unit for Sexual Offenders (CCUSO) in Cherokee, Iowa, constitutionally deficient medical care in violation of the Eighth Amendment. Benson failed to properly and timely diagnosis Scott's condition of Fournier's gangrene. After Scott was properly diagnosed he incurred two surgeries, and during the second surgery suffered a heart attack. Scott, for many years an amputee with only one leg, lost his second leg to an infection shortly thereafter.

Scott was represented by Patrick Thomas Parry of Sioux City and Benson by Iowa Assistant Attorney General Gretchen Witte Kraemer of Des Moines. Both Mr. Parry and Ms. Kraemer were excellent advocates both pre-trial and at the bench trial held on January 20, 2016. They were extremely well-prepared, exceptionally well-organized, and a pleasure to work with. They are a shining example that trial lawyers can be very zealous advocates, while being exceptionally professional to one another, opposing clients, witnesses, and the court, in a long-running emotionally charged case – with no

love lost between respective clients. They worked cooperatively and very reasonably to resolve this difficult dispute. Even though this was a bench trial, they exemplified the type of trial lawyers exalted by nationally known and respected trial lawyers Steve D. Susman and Thomas M. Melsheimer, in their law review article *Trial By Agreement: How Trial Lawyers Hold the Key to Improving Jury Trials in Civil Cases*, 32 REV. LITIG. 431 (2013). Most likely without knowing, they practiced what Mr. Susman teaches at his website: http://trialbyagreement.com/. What a pleasant reprieve from the all too often contentious civil litigation that has unfortunately become the hallmark of our civil justice system, where lawyers pointlessly, needlessly, gratuitously, and incessantly fight over everything and anything – important, or more often, not.

A.      *Procedural History*

This case has a long and complex history, which I recently summarized in C13-4028-MWB (docket no. 84) and will not repeat here.[1] In short, an Iowa jury found Scott has a mental abnormality associated with being a sexually violent predator. *In re Det. Of Scott*, 742 N.W.2d 605 (Table) (Iowa Ct. App. 2007). Since then, Scott has resided at the CCUSO facility.

On August 5, 2011, Scott filed the present complaint, alleging that:

> (1) he is improperly required to follow certain dietary restrictions due to illness; (2) his electric wheelchair was improperly taken from him as a form of punishment; (3) his mail is being opened to confiscate contraband; (4) CCUSO has provided him insufficient handicap facilities; and (5) CCUSO has insufficient measures to prevent the spread of infectious disease, specifically, Methicillin-resistant Staphylococcus Aureus, MRSA.

---

[1] C13-4028-MWB was Scott's recently dismissed companion case.

docket no. 10. The defendants then filed several motions, including a motion for summary judgment. On September 28, 2012, Judge O'Brien entered an order granting in part and denying in part the defendants' motion for summary judgment. (docket no. 48). Judge O'Brien dismissed certain defendant(s) but denied the motion for summary judgment against Benson. The defendant appealed, and the Eighth Circuit Court of Appeals reversed Judge O'Brien's ruling and stated that he had used the wrong legal standard. Specifically, the Eighth Circuit Court of Appeals found that:

> [b]oth parties argued to the district court that the deliberate indifference standard from the Eighth Amendment should govern Scott's Fourteenth Amendment claim. Relying on a non-binding case, *McDonald v. Eilers*, Civ. No. 88-2751, 1988 WL 131360, at *2 (E.D. Pa. Dec. 7, 1988), the district court instead analyzed Scott's claim under the professional judgment standard from *Youngberg v. Romeo*, 457 U.S. 307 (1982).

*Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014). The court went on to say:

> where a patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment. *Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006). Accordingly, the district court should have applied the deliberate indifference standard to Scott's claim.

*Scott*, 742 F.3d at 339.

Based on this ruling, Judge O'Brien ordered additional briefing. On May 12, 2014, Judge O'Brien, again, denied the motion for summary judgment, this time applying the deliberate indifference standard. (docket no. 87.). After Judge O'Brien passed away, this case was reassigned to me. On January 20, 2016, I held a one-day bench trial at the CCUSO facility in Cherokee, Iowa.

3

## B.    *Factual Findings*

When the state of Iowa committed Scott to CCUSO, he already suffered from a number of medical issues.  A traffic accident earlier in his life resulted in the amputation of his leg.  He suffered from diabetes, heart issues, and was prone to infections.  Scott is susceptible to skin sores, ulcers, and boils, especially on his upper legs and around his amputation site.  Benson and the rest of the medical staff at CCUSO were aware of Scott's medical issues and had treated Scott for skin infections numerous times before August, 2010.  Benson admitted that Scott's condition was one that merited close attention and that Scott had been referred to University of Iowa Hospital several times prior to the events giving rise to this case.

The relevant facts occurred in August and September 2010.  Scott testified that he first told Benson that he had a boil on his lower backside on August 2, 2010.[2]  Benson's notes verify that she saw Scott on August 2, 2010, but say nothing of a boil or an infection.  However, those notes were not transcribed until August 13, 2010 and were not signed until August 16, 2010, two weeks after the actual appointment.  Benson testified her normal practice was to have her notes transcribed as soon as possible and she had no explanation for why those notes took so long to get transcribed.  The rest of her notes were transcribed within a few days of the patient contact being recorded.  I think it likely that Scott told Benson about his boil on August 2, 2010.  Everything about Scott and his patient history lends credibility to the idea that he complained to Benson early and often.  Benson took no steps to treat Scott's boil on August 2, 2010.  Scott testified that he next complained about the boils on August 10, 2010.  There is no medical record from Benson regarding that date.  However, the medical evidence does show that

---

[2]  Throughout this ruling, as well as the parties' filings, the sore on Scott's backside is alternately referred to as an ulcer, an abscess, a boil, and a wound.  For our purposes, there is no medically significant distinction in those terms.

Scott returned from an (unrelated) procedure at the University of Iowa Hospital on August 9, 2010. It seems likely that Scott talked to someone on CCUSO's medical staff when he returned from Iowa City, so I also find credible his statement that he told Benson about the boils on August 10, 2010.

The first undisputed time that Scott sought treatment for the boil on his upper thigh was on August 16, 2010. On that date, Benson examined the affected area on Scott's backside. Scott testified that the infection was obvious, while in both her live testimony and her notes, Benson contends the boils were minor and "scabbed over." Benson prescribed an oral antibiotic, Cipro, for Scott. Benson stated she only did so because Scott was requesting medication, not because she felt medication was necessary. She characterized the boils/ulcers as a "superficial scratch." Benson testified that she thought Cipro would be appropriate medication because it is especially useful in treating infections in diabetic patients and it was what Scott wanted.

Once Benson prescribes medication to a CCUSO patient, it is administered by other CCUSO staff members. CCUSO keeps records of all medications given to patients. Scott testified that he does not know if he received the Cipro prescribed by Benson. He testified that he receives lots of medication and did not "feel" like he was getting Cipro. That testimony is not credible. The medication distribution records, kept by CCUSO in their normal course of business, show that Scott received Cipro for ten days, until August 26, 2010. There is no legitimate reason to doubt that Scott received the medication prescribed by Benson as set out in exhibit 10.

Scott saw Benson again on August 23, 2010. Scott complained that he had been running an occasional fever over the previous few days, and that the "boils" were getting worse. Benson again dismissed the sores on Scott's thigh, speculating in her notes that "I do not see an evidence of a boil, once again it is my suspicion that this is some type of self-harm . . . by Mr. Scott." (exhibit 9, p. 3). However, Benson kept Scott on the

5

Cipro. Scott testified that Benson told him during the examination that she felt he was lying about his symptoms. Benson denied calling Scott a "liar." However, she admitted that she believes Scott "embellishes" his statements, that she did not believe what he said, and that she does not find him truthful. Benson also stated that Scott is the single most difficult patient she has ever dealt with at CCUSO. I have no doubt that Benson either called Scott a liar, or at least heavily implied she thought Scott was lying.

Three days later, Scott developed an overnight fever and Benson summoned him to clinic on August 27, 2010. Benson's note from that day states that she had received overnight telephone calls from CCUSO staff members who were concerned about a draining ulcer on Scott's thigh. Benson's note again minimizes Scott's wound(s), stating that they are in various stages of healing. However, she does observe that "just distal to the healing open areas is a pinpoint hole that when the area around it is pressed on, large amounts of thick purulent drainage, foul smelling expelled." (exhibit 9, p. 4). Benson stated in her notes that "the end of a sterile Q-Tip was put into this hole to determine the depth. It is about .5 cm [deep]. The area does bleed some. . . It certainly seems that this infective abscess is localized." (exhibit 9, p. 4). Benson prescribed the antibiotic Augmentin to treat the continued infection and recommended the use of sterile bandages. Again, I find Scott was given the Augmentin, and CCUSO continued to provide it to him until September 6, 2010, per exhibit 10. Benson also told Scott that his non-compliance with his diabetic diet and his failure to take diabetes medicine likely contributed to the infection.

Benson brought Scott back to medical clinic on August 30, 2010. Scott told her that his leg/thigh was still full of pus (infectious discharge) but Benson stated in her note that, "the four open areas that were present on previous visit . . . are all primarily healed. . . There is a pinpoint area that was open on the last visit. It remains open. There is some purulent yellow drainage coming from that area. In trying to expel the drainage

there is very little purulent drainage to this area. We do get some red bleeding, minimal amount . . . it seems that his abscess that was present and draining is resolving. . . We seem to be managing his abscess on the back of his left thigh well." (exhibit 9, p. 6). After reviewing her notes during the trial, Benson confirmed that, at that time, she felt Scott's infection was healing. Benson stated in her medical note that Scott had been "dramatic" about his infection, and had attempted to get other CCUSO staff members to appreciate how severe the infection was. Importantly, Benson stated in her note that, "Staff did verbalize concerns that it was questionable that [Scott] was even taking his oral antibiotic that were currently ordered. They state he takes it but wonder if he is spitting it out when returns to his room. We will continue to follow him and do the best we can." (exhibit no. 9, p. 6). Again, this makes clear that CCUSO was providing Scott the oral antibiotic. When questioned during the trial, Scott stated that he was taking the medication that he was given, but may have "puked" the pills up as his infection got worse.

Over the ensuing three days, Scott continued to be very vocal to CCUSO staff members about his worsening condition, including throwing up in public and crying. A staff note from a non-defendant CCUO staff member is part of the record affirming that Scott was spending considerable time and effort trying to get someone to take his condition more seriously. (exhibit 11). Benson brought Scott back to the clinic on September 2, 2010. Benson examined Scott and stated "there are no areas of infection noted. The areas that were scrapped . . . previously this week seem to be healing." (exhibit 9, p. 7). Benson openly speculates in her notes that some new scratches are self-inflicted by Scott and goes on to say that, "there are no boils anywhere. . . There doesn't seem to be any drainage. . ." *Id.* However, Benson does note that the appearance of Scott's thigh had changed, with some purplish discoloration. The bulk of Benson's note is consumed by Benson speculating about how Scott's condition, to the extent it exists, is

self-inflicted and how Benson felt that Scott was being overly dramatic. Benson stated in her notes that she thought Scott was trying to kill himself. Benson confirmed during the trial that she felt Scott was exaggerating the severity of his symptoms and that she felt his actual problems were largely self-harm.

In the early morning of September 4, 2010, CCUSO staff called Benson at home to tell her that Scott was gagging. September 4, 2010, was the Saturday of Labor Day weekend; Benson would not normally return to work until Tuesday, September 7, 2010. Benson took no action other than to ask for an update in a few hours. Later Saturday morning, Benson placed Scott on bed rest and a liquid diet. One CCUSO staff member who called Benson told her that Scott may be gagging up blood, but later a staffer told Benson that Scott had stopped gagging. Other notes indicate that, later during the weekend, Scott continued to gag. Benson's notes, which are simply recordings of telephone conversations she had over the long weekend, are not particularly clear. On Monday, September 6, 2010, CCUSO staff called Benson several times to detail Scott's deterioration. Amazingly, one staff member called to tell Benson that Scott's infection was very foul smelling, and Benson told that staff member that they were not qualified to examine Scott. Benson took no action on Monday, other than telling staff members that she would examine Scott on Tuesday. For his part, Scott testified that he was in steady decline over the long Labor Day weekend, that he was vocal about his condition, and that Benson did little to help him. There is no reason to doubt his testimony, as we know that Scott was succumbing to a very severe infection and Benson's own notes confirm that she did nothing to help Scott over the weekend.

What happened next is not really disputed. Benson examined Scott on Tuesday, September 7, 2010. She noted a necrotic area on his back thigh/scrotum area that measured 13 x 6 centimeters. Benson had Scott transferred by ambulance to the

University of Iowa Hospital.[3]  Twice, the doctors at the University of Iowa Hospital surgically debrided Scott's wound.[4]  Scott stated that people at the University of Iowa Hospital told him it "was the worst case of gangrene they had ever seen," and it "must have set in one and a half to two weeks before treatment from the hospital."  During the second debriding surgery, Scott suffered a heart attack, which required additional care and recovery.[5]

Scott returned to CCUSO on September 17, 2010.  CCUSO and Benson took pains to ensure Scott's ongoing care, and there really is no dispute that they properly administered the medicine ordered by the University of Iowa Hospital and continued to change Scott's bandages after Scott returned from the University of Iowa Hospital.  Scott refused to be treated by Benson for three days after returning from the University of Iowa Hospital, but accepted her care starting on September 21, 2010.)  However, Scott's leg became red and swollen.  (exhibit 9, p. 14).  On October 7, 2010, Benson stated in her notes that, "the healing status [of Scott's leg] is questionable."  (exhibit 9, p. 15).  Benson also stated Scott spent too much time sitting on his backside, which put increased pressure on the wound.  Around October 9, 2010, Scott began running a fever, and became non-complaint which treatment.  Benson observed that "Scott's condition, at best, is tenuous."  (exhibit 9, p. 16).  On October 16, 2010, a CCUSO staff member found Scott non-responsive.  CCUSO sent Scott to the local hospital, and few days later he was again

---

[3]  Because this part of Scott's case is largely undisputed, I do not need to dwell on the more gory details of Scott's condition, including the fact that his infection was so severe that he was wrapped in a body bag as he was transported to the University of Iowa Hospital to protect others from both the smell of the infection and the possibility of contamination.  However, since Scott was forced to suffer through that situation, I would be remiss not to mention it.

[4]  Debrided means that the infected tissue was cut away.

[5]  The medical testimony, which will be discussed more below, supports a finding that both the surgery and the underlying infection were contributing causes of the heart attack.  (exhibits 4 and 6)

transferred to the University of Iowa Hospital. On October 27, 2010, doctors amputated Scott's remaining leg to stop the spread of the infection. Scott eventually recovered and was able to return to CCUSO.

The parties submitted deposition transcripts and stipulations from Scott's treating providers at the University of Iowa Hospital to answer the questions of whether: (1) Benson's care (or lack thereof) caused Scott's condition; and (2) can the subsequent heart attack and leg amputation be connected to the original infection?

Dr. Gerald Kealey is a long time professor and surgeon at the University of Iowa Hospital. Dr. Kealey was Scott's treating physician after Scott arrived on September 7, 2010. Dr. Kealey identified Scott's infection as Fournier's gangrene.[6] (exhibit 2, p. 22). Dr. Kealey explained that Scott's testimony about his condition is consistent with the normal progression of the infection, because Fournier's gangrene starts in an existing sore, such as skin boil or ulcer, in the lower posterior region. (exhibit 2, p. 9-11). Suddenly, that sore will began to grow out of control into a severe infection. Dr. Kealey explained that Scott was the typical Fournier's patient, in that he was diabetic and obese, with poor circulation, high blood pressure, and renal issues. Dr. Kealey characterized Scott as being in a high risk group. (exhibit 2, p. 34).

One important fact that Dr. Kealey explained is that this type of infection spreads horizontally under the skin. (exhibit 2, p. 19-22). Thus, the depth of the infection is irrelevant when gauging its severity. The real question is how far out the infection has spread under the skin. Benson admitted that, in 2010, she did not understand how

---

[6] Fournier's gangrene, also known as necrotizing fasciitis, also known colloquially as gangrene or flesh eating disease, is a very severe infection, if not one of the most severe infections. Dr. Kealey stated that, if Fournier's is not promptly treated, it has a hundred percent mortality rate. The parties do not dispute this fact.

Fournier's spread. She testified that she thought she could gauge the severity of the infection by checking to see how deep it was.

Dr. Kealey testified that Scott's infection was severe for at least 24 hours before Scott arrived at the University of Iowa Hospital, and that the infection may have been severe for as long as 72 hours before Scott left Cherokee. Dr. Kealey drew this conclusion from the fact that top of layer of Scott's skin and fat had been totally liquefied by the infection and lost all structural integrity. Dr. Kealey agreed that it was possible that Scott's condition had progressed for over three weeks before Scott presented at the University of Iowa Hospital. (exhibit 2, p. 24). Dr. Kealey testified that the only way to completely treat this type of infection is with surgical debridement, completely cutting out the infected tissue. However, Dr. Kealey testified that antibiotics, such as Cipro and Augmentin, are a critical part of the treatment plan.

The parties asked Dr. Kealey about how Benson handled Scott's case. Dr. Kealey was generally supportive of Benson's early treatment of Scott. Dr. Kealey praised the fact that Benson seemed to listen to Scott and looked at the affected area. He also supported her prescription of antibiotics at the point when only irritation, with no infected drainage, was visible. However, Dr. Kealey strongly rejected Benson's treatment on August 27, 2010, and thereafter. Dr. Kealey testified that, once Benson began observing drainage from Scott's abscess, the only way to completely treat the wound was by opening it up (surgically) and removing the infected liquid. However, Dr. Kealey could not conclude that the infection on August 27, 2010, directly lead to Scott's admission to the University of Iowa Hospital. Rather, Dr. Kealey identified September 3, 2010 – right before the long Labor Day weekend – as the point where he was sure that the final infection had begun. Dr. Kealey did not rule out the infections all being related; rather he identified September 3, 2010, as the date the infection had begun for sure.

The parties also deposed Dr. Dionne Skeete, the surgeon that debrided Scott's infection. Dr. Skeete largely agreed with Dr. Kealey's testimony. Dr. Skeete affirmed that it is impossible to tell the severity of this type of infection by its depth, because the infection spreads out underneath the skin. Dr. Skeete also agreed that the infection must have been spreading for some period of time before Scott arrived at the University of Iowa Hospital based on its severity. She stated that Scott had many risk factors for a Fournier's infection and that the infection often starts as a boil or an ulcer. Importantly, Dr. Skeete agreed that once an infection is draining a foul smelling discharge, surgical intervention is necessary. (exhibit 4, p. 21). Dr. Skeete stated that at that point, a patient should be referred for a surgical consult if the examining practitioner is not competent to perform the surgery. *Id*.

Dr. Joseph Buckwalter, a University of Iowa Hospital physician who treated Scott at numerous points, provided a stipulation about Scott's second admission at the University of Iowa Hospital in October, 2010. Dr. Buckwalter opined that Scott's second admission to the hospital was a result of his general poor health and the fact that he was "a very sick person." (exhibit 6, p. 1-2). However, Dr. Buckwalter explained that he did not believe that the Fournier's infection directly caused the infection that necessitated Scott's second leg being amputated. *Id*. Meaning, the second infection was not a direct continuation of the first infection.

Finally, the parties provided a short statement from Dr. Elaine Demetroulis, the University of Iowa Hospital cardiologist who treated Scott's heart attack. Dr. Demetroulis stated that the Fournier's infection was a contributing cause of Scott's heart attack. (exhibit 8).

## II.     APPLICATION OF LAW TO FACT

### A. Issues

There is only one issue in this trial: was Benson deliberately indifferent to Scott's serious medical need.

### B. Standard

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Courts also apply the deliberate indifference standard to civilly committed individuals. *See Senty–Haugen v. Goodno*, 462 F.3d 876, 889 (8th Cir. 2006), which applied the deliberate indifference standard to a medical-care claim raised by a patient involuntarily committed as a sexually violent predator under the Fourteenth Amendment. *See also Scott*, 742 F.3d at 339, stating, "where a patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment. *Senty–Haugen*, 462 F.3d at 889–90."

To prevail on such a claim, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the first requirement, an objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)). Under the second requirement, an official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). "Although the level of blameworthiness must rise above

negligence, a plaintiff does not have to show that the prison officials acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Farmer*, 511 U.S. at 835). However, a claimant's "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

### C. Analysis - August 2, 2010 through September 3, 2010

The first question in the deliberate indifference analysis is whether Scott had an objectively serious medical need. There is no dispute, reasonable or otherwise, that Scott has proven he had an objectively serious medical. He was diabetic and prone to infections. While under Benson's care, Scott developed Fournier's gangrene, an infection with a fifty percent mortality rate ***when properly treated***. The infection spread out of control, requiring two surgeries to treat. During the second surgery, Scott suffered a heart attack. Although Scott recovered he was, according to Dr. Buckwalter, a "very sick person." Within a month of being released from the University of Iowa Hospital, a second infection spread out of control through Scott's foot, and doctors were forced to amputate his leg.

The second deliberate indifference element, and the real fighting issue in this case, is whether Benson knew of the serious need (or should have known) yet deliberately disregarded it. Scott must present evidence which supports a finding that Benson "acted with a sufficiently culpable state of mind, namely, that [she] actually knew of, but deliberately disregarded [his] medical needs." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (internal citations and quotation marks omitted).

Clearly, after Scott's boil began draining pus, Benson provided negligent medical care to Scott.[7] First, Benson admitted that Scott was in a high risk group for an infection. But, instead of keeping a close eye on Scott's condition, she let her personal distrust of Scott blind her to the warning signs of his condition. Second, by August 27, 2010, Scott's leg wound was dispelling a large amount of foul smelling pus. The medical experts agreed that at that point, the only proper course of treatment was a surgical intervention. They agreed that the wound needed to be opened up and drained. But all Benson did was bandage the ulcer. Third, Benson admitted that she was unaware of the typical progression of Fournier's gangrene. Instead of understanding that the infection spread horizontally under the skin, Benson checked how deep the infected opening was. The medical experts who opined on this issue agreed that Benson misunderstood the infection and that her "depth" test was useless.[8]

However, negligence does not amount to deliberate indifference.

Negligent misdiagnosis does not create a cognizable claim under § 1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. *See also Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) ("Medical malpractice alone … is not actionable under the Eighth Amendment."). "'Deliberate indifference' entails a level of culpability equal to the

---

[7] The medical experts agree that there was no issue with Benson's treatment of Scott prior to the point where his boil/ulcer began draining pus.

[8] Dr. Kealey could not say for certain that Benson's misunderstanding fell below the applicable standard of care. Dr. Kealey stated that, although nurse practitioners at the University of Iowa Hospital understood that infections progressed horizontally under the skin, he did not know if nurse practitioners generally understood how the infection spread. (exhibit 2, p. 12).

criminal law definition of recklessness, that is, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004), quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970.

*McRaven v. Sanders*, 577 F.3d 974, 982-83 (8th Cir. 2009).

In the period between Scott first complaining of boils (August 2, 2010) and the start of the Labor Day weekend 2010, there is no evidence of a level of culpability equal to recklessness.[9] Instead, Benson was merely negligent. This is because, although Benson was dismissive of Scott, misinformed about the progression of the infection, and ill-informed about the proper course of treatment, Benson took at least two steps to treat Scott. First, Benson repeatedly saw Scott, examined the affected area and bandaged it. Both the case law and the medical experts in this case agree that examining the affected area was the first step in treating Scott. Although the Eighth Circuit Court of Appeals has not found that multiple instances of contact between the treatment provider and the plaintiff precludes a finding of deliberate indifference, it has implied that numerous contacts between the patient and provider is a sign that the medical providers' care was better than deliberately indifferent. *See Jolly*, 205 F.3d at 1097, stating that it "is also undisputed that [the doctor] saw [the plaintiff] on numerous occasions. . . Although multiple contacts with medical personnel do not always preclude a finding of deliberate indifference, *see Warren v. Fanning*, 950 F.2d 1370, 1373 (8th Cir.1991), *cert. denied*, 506 U.S. 836, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992), [the doctor's] actions in this case cannot reasonably be said to reflect deliberate indifference." More importantly, in this case, Dr. Kealey testified that, initially, Benson "[gave] a pretty good description of a .

---

[9] Dr. Kealey identified September 3, 2010, the outset of the Labor Day weekend, as the day he was certain Scott's Fournier's gangrene had started. (exhibit 2, p. 13). Because his opinion is undisputed in the record, I will analyze the treatment on and after September 3, 2010, separately.

. . crotch ulceration . . . [and] sets off on a fairly reasonable course of treatment . . . [because] [s]he paid attention to the patient." (exhibit 2, p. 11). Second, Benson prescribed Scott two oral antibiotics. "[C]ourts hesitate to find [a deliberate indifference] violation when a prison inmate has received medical care. . ." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990). Again, more importantly in this case, the medical experts seem to agree that providing oral antibiotics was a reasonable step for Benson to take. Dr. Kealey stated that "antibiotics are an integral part of controlling an infectious problem." (exhibit 2, p. 7). Dr. Skeete testified that the antibiotic Augmentin was an appropriate antibiotic for the "gram-negative bacteria" that seemingly affected Scott. (exhibit 4, p. 8). Even though both of those doctors would have gone farther, and surgically lanced the wound, there is no evidence that Benson was "reckless'" by failing to do that. In fact, as will be discussed below, Dr. Kealey stated that Benson's mistake was common.

Of course, during this time period, Scott requested additional treatment, up to and including being transferred to the University of Iowa Hospital. However, "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). The fact that Scott requested additional treatment does not defeat the fact that Benson did provide some treatment and, although negligent, that treatment was not reckless. Put another way, "where medical records indicate treatment was provided and physician affidavits indicate care was adequate, inmate cannot create [a] fact question merely by stating he did not believe treatment was adequate" *Dawes v. Jeter*, 209 F. App'x 609, 610 (8th Cir. 2006) (unpublished).[10]

---

[10] Obviously, that statement was made in the context of a motion for summary judgment, but the Eighth Circuit Court of Appeals's point is applicable regardless of the stage of litigation.

Because Benson was, at most, negligent through September 3, 2010, Scott has failed to prove that Benson was deliberately indifferent to his serious medical need during that time period.

### D. Analysis - September 3, 2010 through September 7, 2010

Dr. Kealey opined that, by September 3, 2010, the Fournier's gangrene infection had started. Thus, that Labor Day weekend merits particular attention. There is no doubt that, throughout that weekend, Scott's condition deteriorated. However, through September 5, 2010, Benson continued to provide Scott some level of care. When CCUSO staff called her on September 4, 2010, Benson asked staff to monitor Scott's condition and provide updates. When she heard he had not improved, she placed Scott on bed rest and a liquid diet. She continued Scott on Augmentin through Sunday, September 5, 2010. (exhibit 10, p. 1). Because Benson continued to provide Scott some treatment, there is no evidence from either September 4, 2010 or September 5, 2010, to indicate that Benson's care was reckless. Most importantly, Dr. Kealey testified that Benson's failure to refer Scott for more intensive treatment by September 3, 2010 was a "reasonable' mistake." He also stated that the mistake Benson made is "frequently made." (exhibit 2, p. 15.). Thus, through Sunday, September 5, 2010, Scott has failed to prove that Benson was deliberately indifferent to his serious medical need.

However, that changed on Monday, September 6, 2010. On that day, CCUSO staff called Benson several times to detail Scott's deterioration. One staff member called to tell Benson that Scott's infection was very foul smelling, but Benson told that staff member that they were not qualified to examine Scott. Benson did nothing in response. Instead of offering prompt intervention, Benson told CCUSO staff that she would examine Scott when she returned to work the next day. At this point, Benson's action, or lack thereof, ceased being negligent and became reckless. Benson knew of a serious medical risk to Scott, an infection that had become foul smelling to the point where a lay

person could recognize its severity, and consciously chose to do nothing. That is the very definition of deliberate indifference.

Benson should have sent Scott for treatment on September 6, 2010. Instead, she waited until the next day, September 7, 2010. "Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Benson clearly, and intentionally, delayed treating Scott. But what is the effect of that delay? The Eighth Circuit Court of Appeals has stated that:

> [when] [plaintiff's] deliberate-indifference claim is based on "a delay in medical treatment," we measure "the objective seriousness of the deprivation … by reference to the effect of delay in treatment." *Id.* (quotations and citations omitted). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment[.]'" *Id.* (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). Applying this standard, we have previously held that where an inmate "submitted evidence documenting his diagnosis and treatment, [but] he offered no evidence establishing that any delay in treatment had a detrimental effect," the inmate "failed to raise a genuine issue of fact on an essential element of his claim." *Id.* (citing *Dulany v. Carnahan*, 132 F.3d 1234, 143 (8th Cir. 1997) (holding that summary judgment in favor of the defendants was not in error as to inmate-plaintiffs, where neither submitted verifying medical evidence indicating that a delay in treatment resulted in an adverse effect)).

*Jackson v. Riebold*, 2016 WL 722947 at *4-5 (slip copy) (8th Cir. 2016).

In this case, Scott has failed to place any verified medical evidence in the record that shows the effect of the delay in treatment. Neither Dr. Kealey, nor Dr. Skeete, offered any assessment of what effect the delay from Monday to Tuesday had on Scott. The closest Scott gets to that type of medical information is Dr. Kealey's statement that

"the sooner you operate and control, the better the survivorship, and the less tissue you have to remove." (exhibit 2, p. 13). But, there is also contrary medical evidence in the record. When asked if she could tell how long Scott had the Fournier's gangrene before presenting at the University of Iowa Hospital, Dr. Skeete replied "not with an absolute certainty, I mean, ***it was not overnight***. So it had been going on for a few days." (exhibit 4, p. 3). Dr. Skeete's statement implies that the overnight delay did not have a huge effect on Scott's condition.

I could speculate that the delay in treatment exacerbated Scott's condition. Perhaps if he had been sent to the University of Iowa Hospital on Monday instead of Tuesday, the infection would have been smaller, and would not have required the second, heart attack inducing, surgery. Perhaps the lessened toll on Scott's body would have helped to prevent the second infection. However, the medical evidence leads to no such conclusions. When asked why Scott needed two surgeries to remove the tissue infected with Fournier's, Dr. Skeete replied that:

> the surgical team taking care of him felt that the infection had continued to spread, so they took him to remove more tissue . . . We . . . try to get to clean margins, but the continued spread of this infection is something that's well documented in that – and that's why we look at the wound margins. Because we don't have a microscope when we do surgery. So the bacteria tissue may look healthy, but the bacteria may still be at the edges and continue to spread. So looking at the wound every day to make sure the spread of infection is pretty typical care. . . [Scott's infection was not] remarkable in my review of how we treated him initially or afterwards.

(exhibit 4, p. 4). In essence, Dr. Skeete's answer is that sometimes people need two surgeries. The most likely reason is because the surgical team missed some of the infection the first time. (exhibit 4, p. 7). She went on to say any infection may require a second surgery, because the infectious microbes are not always visible to the naked

eye, and sometimes they get missed.  If any infection could require two surgeries, there is no way, based on the medical evidence of record, that I could find the delay from Monday to Tuesday caused Scott to require two surgeries.[11]

Nothing in the record shows that Scott was treated differently, or more intensely because he arrived at the University of Iowa Hospital on Tuesday, rather than on Monday. There is no medical evidence that states doctors cut away more necrotic tissue because of the delay.  No rehab professional testified that Scott's recovery lasted longer because of the delay.  Simply put, there is no medical evidence upon which I can base a finding that the delay had any measurable effect on Scott's condition.  Accordingly, Scott has failed to show how the delay in treatment affected his condition.  As stated above, under the precedent of the Eighth Circuit Court of Appeals, without verified medical evidence showing that the delay had a detrimental effect on Scott's condition, I cannot find deliberate indifference based on the delay in treatment.  Accordingly, Scott has failed to prove his case.

### III.    CONCLUSION

This is a tragic example of what happens when people society needs to institutionalize receive sub-standard medical care.  This happened because, either funds are too tight to provide adequate care, or the system in place is very poorly managed, or both.    While this lawsuit provides no remedy because the Eighth Amendment constitutional standard is so high, another tragedy like this one is likely to reoccur unless the State of Iowa takes some positive affirmative action to improve medical care at the CCUSO in Cherokee.  On a more positive note, during my tour of the facility with the

---

[11] Additionally, Dr. Buckwalter made clear that the second infection, in October, was not a direct result of the Fournier's infection.  (exhibit 6, p. 1)

lawyers, I did find that the physical living conditions for those offenders housed in the areas I toured appeared excellent and very well managed.

For the reasons discussed above, the plaintiff has failed to prove his claim by a preponderance of the evidence. Accordingly, I find in the defendant's favor. Plaintiff's claim is **denied** and this case **dismissed**.

**IT IS SO ORDERED**.

**DATED** this 11th day of March, 2016.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA